# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

\* \* \*

HOMESITE INSURANCE COMPANY, *et. al.*,

　　　　　Plaintiffs,

　　v.

NORCOLD, INC., *et al.*,

　　　　　Defendants.

Case No. 2:21-cv-02167-RFB-DJA

**ORDER**

　　　　Before the Court are three motions for summary judgment (ECF Nos. 175, 178, 182). For the following reasons: Plaintiffs' Motion for Partial Summary Judgment, or in the Alternative for an Order Treating Specified Facts as Established (ECF No. 178) is denied; Defendants' Motion for Partial Summary Judgment is granted (ECF No. 182); and Defendant CWI, Inc.'s Motion for Summary Judgment (ECF No. 175) is partially granted.

## I.　PROCEDURAL HISTORY

　　　　On November 5, 2021, Plaintiff Homesite Insurance Company ("Homesite") filed a subrogation action against Norcold, Inc., Thetford Corporation, Camping World, Inc., and Camping World of Henderson in the Clark County District Court of the State of Nevada. See ECF No. 1-1. On December 8, 2021, Defendants removed this action to federal court. See ECF No. 1.

　　　　On December 14, 2021, Plaintiffs Traci Marx, Raymond Marx, Alyssa Dillard, and Seth Dillard ("Individual Plaintiffs") filed a product liability action against Norcold, Inc., the Thetford Corporation, the Dyson-Kissner-Moran Corporation ("DKM"), Camping World Holdings, Inc., CWI, Inc., and Camping World of Henderson in the Clark County District Court of the State of

Nevada. See Marx et al. v. Norcold, Inc. et al., No. 2:22-cv-00085-RFB-EJY (D. Nev. Jan 18, 2022) (No. 1-1). On January 18, 2022, Defendants removed this action to federal court.

On May 18, 2022, the Court ordered that both actions be consolidated under Homesite's case. See ECF No. 38. Shortly thereafter, Plaintiff Homesite amended its complaint to add CWI, Inc. and DKM as defendants. See ECF Nos. 50, 93. Plaintiffs also added Norcold LLC and Thetford LLC as defendants. See ECF Nos. 60, 67.

On August 14, 2024, the Court dismissed Defendants Camping World Holdings Inc. and Camping World, Inc. from this consolidated action pursuant to the Parties' Stipulation for Dismissal. See ECF No. 162.

On October 29, 2024, Defendant CWI, Inc. filed a motion for summary judgment. See ECF No. 175. Plaintiffs responded on November 18, 2024. See ECF No. 188. Defendant CWI, Inc. replied on December 3, 2024. See ECF No. 199.

On October 30, 2024, Plaintiffs filed a joint motion for summary judgment against Norcold Inc./Norcold LLC, Thetford Inc./Thetford LLC, and DKM (collectively, the "Norcold Defendants"). See ECF No. 178. The Norcold Defendants responded on November 21, 2024. See ECF No. 191. Plaintiffs replied on December 4, 2024. See ECF No. 199.

On October 31, 2024, the Norcold Defendants filed a motion for partial summary judgment against the Individual Plaintiffs. See ECF No. 182. The Individual Plaintiffs responded on November 21, 2024. See ECF No. 194. The Norcold Defendants replied on December 5, 2024. See ECF No. 201.

On September 3, 2025, the Court a held hearing and issued preliminary rulings on these motions for summary judgment. See ECF No. 214. The Court's full opinion follows.

## II.   FACTUAL BACKGROUND

### A. Undisputed Facts

Based on its review of the record, the Court finds the following facts to be undisputed.

In 2001, Nyada and Leon Marx purchased a 1999 Holiday Rambler Endeavour Class A Motorhome ("RV") from an unidentified dealer on Boulder Highway near Las Vegas, Nevada.

The Individual Plaintiffs are their immediate relatives.[1] The RV was never owned by the Individual Plaintiffs, as its title was placed in a family trust. Nevertheless, they did occasionally use it until it was destroyed.

The RV contained a Norcold 1200 Series gas absorption refrigerator ("Refrigerator") that was designed, manufactured, and sold by Norcold LLC (f/k/a Norcold, Inc.). Norcold LLC is a wholly owned subsidiary of Thetford LLC (f/k/a Thetford Corporation), which was a wholly owned subsidiary of DKM throughout the operative time period—i.e., 2001 through 2018.

Throughout this period, Norcold maintained an incident log that recorded over 3000 claims specific to their gas absorption refrigerators. Furthermore, Norcold initiated several product safety recalls that covered the Refrigerator, particularly its cooling unit. According to some of them, the cooling unit's boiler tube could potentially leak flammable gases. Consequently, Nyada and Leon Marx took the RV to Camping World of Henderson ("Camping World") to have it serviced. Camping World is an outdoor retailer, and it was operated by CWI, Inc. up until January 2023. Notably, The Individual Plaintiffs had no contact with CWI, Inc. regarding the Refrigerator during the operative time period.

CWI, Inc. and Norcold have a longstanding contractual relationship regarding the sale, service, repair, and recall of Norcold-branded gas absorption refrigerators. Pursuant to this relationship, CWI, Inc. performed recall work on the Marx's Refrigerator. In 2005, it replaced the Refrigerator's cooling unit. Then, on March 28, 2011, it retrofitted the Refrigerator with a high temperature sensor safety device ("HTS safety device"). This device was designed to shut off refrigerators before they reach dangerous temperatures. Norcold provided parts to CWI, Inc., directly paid CWI, Inc., and required CWI, Inc. to install the HTS safety device according to its written instructions.

On December 21, 2018, a fire erupted within the RV while it was parked outside Traci and Ray Marx's home, which was located at 6040 Pooh Corner Street, Las Vegas, NV 89110. Alyssa and Seth Dillard were living at their home at this time. The fire caused extensive damage to the

---

[1] Raymond Marx is the son of Nyada and Leon Marx, and he is married to Traci Marx. Alyssa Dillard is the daughter of Raymond and Traci Marx, and she is married to Seth Dillard.

1  home, and the Individual Plaintiffs moved into a series of temporary housing arrangements for 2
2  years.
3      At the time of the fire, Traci and Ray Marx's home was insured by Homesite. Pursuant to
4  the terms of their policy, Homesite reimbursed them for the damages resulting from the fire—i.e.,
5  $1,121,222.37.
6      Following the fire, a laboratory examination of the Refrigerator revealed that its boiler tube
7  had ruptured and leaked flammable gases at some point before the fire occurred.

### B. Disputed Facts

9      Meanwhile, the Court finds that the following facts are disputed by the parties.
10     First, the Parties dispute whether the Refrigerator caused the fire. Plaintiffs argue that the
11 Refrigerator must have caused the fire because Defendants have not produced evidence of a
12 plausible, alternate cause. In response, Defendants point to expert testimony that: (a.) identifies
13 other potential causes and (b.) suggests that the Refrigerator did not cause the fire.
14     Second, the Parties dispute whether Traci and Ray Marx's business—i.e., R & R Backhoe,
15 LLC ("Backhoe")—sustained losses because of the fire. By relying on Backhoe's tax records,
16 Traci and Ray Marx claim that their business lost earnings due to the fire. Meanwhile, Defendants
17 argue that aggregate figures from several years are insufficient to tie Backhoe's losses to the fire.
18     Third, the Parties dispute whether CWI, Inc. negligently installed the HTS safety device.
19 CWI, Inc. invokes expert testimony which declares that CWI, Inc. complied with Norcold's
20 instructions to show that CWI, Inc. was not negligent. Meanwhile, Plaintiffs highlight photos and
21 expert statements that show some divergence between Norcold's instructions and CWI, Inc.'s
22 recall work.
23     Fourth, the Parties dispute whether the allegedly negligent installation of the HTS safety
24 device caused the fire. CWI, Inc. claims that there is no competent evidence that CWI, Inc.'s
25 installation work caused the fire. In response, Plaintiffs cite Norcold's instructions and expert
26 testimony, which acknowledge that the improper installation of the HTS safety device may result
27 in fires.
28

### III. LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law governing a matter determines which facts are material to a case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Since all of Plaintiffs' claims arise under state law, the Court looks to Nevada law throughout the course of this Order. See In re Cnty. of Orange, 784 F.3d 520, 527 (9th Cir. 2015) ("[F]ederal courts sitting in diversity apply state substantive law.") (citation omitted).

The moving party bears the burden of showing the absence of material disputes of fact. See Celotex, 477 U.S. at 323. The burden then shifts to the nonmoving party to show specific facts demonstrating a genuine factual dispute for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). When considering the propriety of summary judgment, the Court views all facts and draws all inferences in the light most favorable to the nonmoving party. See Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014).

Nevertheless, the nonmoving party may not merely rest on the allegations of their pleadings. They must produce specific facts by affidavit or other evidence showing a genuine issue of fact. See Anderson, 477 U.S. at 256. In other words, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (internal quotation marks omitted). It is improper for the Court to resolve genuine factual disputes or make credibility determinations at the summary judgment stage. See Zetwick v. Cnty. of Yolo, 850 F.3d 436, 441 (9th Cir. 2017) (citations omitted).

The parties must support their motion and opposition with evidence, and specific references to the record, that they want the Court to consider. See FED. R. CIV. P. 56(c)(A); Carmen v. S.F. Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). It is not the Court's task "to scour the

record in search of a genuine issue of triable fact;" rather, the Court relies on the parties to "identify [evidence] with reasonable particularity . . . ." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996); Schneider v. TRW, Inc., 938 F.2d 986, 990 n.2 (9th Cir. 1991) (A "[d]istrict court is under no obligation to mine the full record for issues of triable fact.").

Finally, if the Court declines to grant summary judgment, "it may enter an order stating any material fact – including an item of damages or other relief – that is not genuinely in dispute and treating the fact as established in the case." FED. R. CIV. P. 56(g).

### IV.   DISCUSSION

#### A. The Court Denies Plaintiffs' Motion for Partial Summary Judgment

Initially, Plaintiffs move for partial summary judgment on certain "affirmative defenses" to their product liability claims.

As a preliminary matter, the Court construes these "affirmative defenses" as denials of Plaintiffs' product liability claims. Under the Federal Rules of Civil Procedure, "[p]leadings must be construed so as to do justice." FED. R. CIV. P. 8(e). In their respective answers, Defendants assert "affirmative defenses" based on the absence of a defect and a lack of causation. Plaintiffs take issue with this label. Nevertheless, Defendants have since clarified that these defenses are "mere denials of Plaintiffs' product liability claims." ECF No. 191 at 7. To that end, the Court construes them as such.

In doing so, the Court streamlines this procedurally convoluted motion. Simply put, Plaintiffs are moving for summary judgment on two elements of their product liability claims: (i.) the Refrigerator had a design defect and (ii.) the Refrigerator caused the fire.

##### i. *Product liability in Nevada.*

To bring a strict product liability claim, a plaintiff must show that the product had a defect which rendered it unreasonably dangerous, the defect existed at the time the product left the manufacturer, and the defect caused the plaintiff's injury. See Fyssakis v. Knight Equip. Corp., 826 P.2d 570, 571 (Nev. 1992). To establish a design defect, a plaintiff must show that a product "failed to perform in the manner reasonably to be expected in light of its nature and intended

- 6 -

1  function and was more dangerous than would be contemplated by the ordinary user having the
2  ordinary knowledge available in the community." Ford Motor Co. v. Trejo, 402 P.3d 649, 652
3  (Nev. 2017) (quoting Ginnis v. Mapes Hotel Corp., 470 P.2d 135, 138 (Nev. 1970) (describing the
4  consumer-expectations test)).

5  Meanwhile, to prevail on a negligence claim, "a plaintiff must establish four elements: (1)
6  the existence of a duty of care, (2) breach of that duty, (3) legal causation, and (4) damages."
7  Sanchez ex rel. Sanchez v. Wal-Mart Stores, Inc., 221 P.3d 1276, 1280 (Nev. 2009) (citation
8  omitted).

9  Here, Plaintiffs urge the Court to rule that the Refrigerator was defective as a matter of law
10 for the purposes of their strict liability claim. Similarly, they ask the Court to declare that the
11 Refrigerator caused fire for the purposes of their strict liability and negligence claims. For the
12 following reasons, the Court declines to rule on these elements as a matter of law, and it denies
13 Plaintiffs' motion in full.

**ii.** ***The Court declines to find that the Refrigerator was defective as a matter of law.***

15 First, the Court addresses the defect argument. In short, Plaintiffs argue that the
16 Refrigerator was defective as a matter of law because it was designed to "leak[ ] flammable gases
17 and ignite[ ] fires that put life and property at risk." ECF No. 200 at 8. Undoubtedly, Plaintiffs
18 offer substantial evidence on this point. It is undisputed that the Refrigerator's boiler tube leaked
19 flammable gases at some point before the fire, irrespective of its HTS safety device. Nevertheless,
20 Defendants cite various pieces of expert testimony which minimize the risk of fires associated with
21 refrigerator leaks. According to Chris Bloom, the Norcold Defendants' fire-cause-origin expert,
22 "refrigerator leaks do[ ] not mean the refrigerator started the fire," and "the rate of incident . . . is
23 extremely slight"—i.e., in "99 out of 100 examples [ ] they do not catch fire." Similarly, one of
24 Plaintiffs' experts acknowledged that "cooling unit [ ] leaks [do not] necessarily cause a fire,"
25 particularly in light of the HTS safety device. Based on this record, the Court declines to hold that
26 the Refrigerator exceeded the normal safety expectations of the average consumer as a matter of
27 law. A reasonable jury could conclude that the risk of fire posed by the Refrigerator did not render
28 it "unreasonably dangerous." In other words, there is a genuine dispute of material fact regarding

the Refrigerator's dangerousness and, therefore, defectiveness.

### iii. *The Court declines to find that the Refrigerator caused the fire as a matter of law.*

Second, the Court addresses Plaintiffs' causation argument. To summarize, they argue that Defendants should be precluded from arguing causation because they have not produced evidence of an alternate cause. But Defendants have presented evidence that weighs against the Refrigerator. Initially, two independent experts who examined the RV concluded that the cause of the fire cannot be determined. Additionally, Mr. Bloom identified multiple potential ignition sources that cannot be ruled out, including the RV's electrical components. Finally, Mr. Bloom asserted that the typical indicators of a gas absorption refrigerator fire were not present in the Refrigerator. Overall, this record gives rise to a genuine dispute of material fact as to causation, and Plaintiffs' attempt to undermine it by attacking Mr. Bloom's findings should be directed at a jury. Cf. City of Pomona v. SQM N. Am. Corp., 750 F.3d 1036, 1049 (9th Cir. 2014) ("A factual dispute is best settled by a battle of the experts before the fact finder, not by judicial fiat.").

In sum, the Court declines to rule on elements of Plaintiffs' product liability claims because they are embroiled in genuine disputes of material fact. Accordingly, the Court denies Plaintiffs' motion for partial summary judgment on these issues.

### B. The Court Grants the Norcold Defendants' Motion for Partial Summary Judgment

The Norcold Defendants move for partial summary judgment against six of the Individual Plaintiffs' claims. The Court addresses each one in turn.

### i. *The Court grants summary judgment against the Individual Plaintiffs' claims for negligence per se, medical expenses, and damages based on an SBA loan.*

As a preliminary matter, the Norcold Defendants argue that the Individual Plaintiffs' independent claims for negligence per se, medical expenses, and damages based on an SBA loan fail as a matter of law. In their opposition, the Individual Plaintiffs agree. See ECF No. 194 at 2. At this procedural posture, it was incumbent on the Individual Plaintiffs to establish genuine disputes of material fact regarding these claims to preserve them. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–86 (1986). Since they did not, the Court grants summary

judgment against them.

### ii. *The Court grants summary judgment against the Individual Plaintiffs' fraudulent concealment claim.*

In Nevada, a plaintiff must establish that the defendant was "under a duty to disclose [a material fact]" to prevail in a fraudulent concealment claim. See Dow Chem. Co. v. Mahlum, 970 P.2d 98, 110 (Nev. 1998) (citation omitted). This duty arises "from the relationship of the parties," namely a fiduciary relationship or a "special relationship." Id. (citation omitted). Parties enjoy a special relationship where one "reasonably imparts special confidence in the defendant and the defendant [ ] reasonably know[s] of this confidence." Id. (citation omitted). According to the Norcold Defendants, they did not owe the Individual Plaintiffs a duty to disclose because the Parties lacked a fiduciary or special relationship. Therefore, their fraudulent concealment claim fails as a matter of law. The Court agrees.

Historically, the Nevada Supreme Court has demanded more than a mere commercial transaction to find a "special relationship." See, e.g., Mackintosh v. Jack Matthews & Co., 855 P.2d 549, 554 (Nev. 1993) ("The [buyers] were not only purchasing the property from [the seller], but were also financing the purchase with this [seller]."). In fact, it has been reluctant to find any kind of relationship between parties that were not "directly involved in the transaction from which [a] lawsuit arose." Dow Chem. Co., 970 P.2d at 111.

Based on these guideposts, the Court finds that the Norcold Defendants did not owe the Individual Plaintiffs a duty to disclose. Initially, the Parties were not engaged in a fiduciary relationship. Furthermore, the Court declines to find a "special relationship" based on their tenuous commercial connection. To recap, the Individual Plaintiffs did not purchase the RV from the Norcold Defendants. Rather, their immediate relatives purchased it from an unidentified third-party. Even if this tenuous connection gives rise to a commercial relationship, it does not create a duty to disclose under Nevada law. See Nev. Power Co. v. Monsanto Co., 891 F.Supp. 1406, 1417 (D. Nev. 1995) (A "straightforward vendor-vendee relationship . . . creates no fraud-based duty to disclose.") (citation omitted) (cited approvingly by Dow Chem. Co., 970 P.2d at 110).

Plaintiffs urge the Court to recognize a "special relationship" based on public policy

considerations. This request is misguided. It relies on authorities that deal with negligence claims. See, e.g., Sparks v. Alpha Tau Omega Fraternity, Inc., 255 P.3d 238, 244 (Nev. 2011) (discussing special relationships that give rise to a duty of care). Nevada's Supreme Court has already provided more precise guidance for "special relationships" in the context of fraud-based claims. This Court declines to legislate against it.

### iii. *The Court grants summary judgment against the Individual Plaintiffs' emotional distress claim(s).*

Next, the Norcold Defendants argue that the Individual Plaintiffs' emotional distress claims are time-barred. Based on the record, it is not entirely clear whether the Individual Plaintiffs are asserting independent claims for emotional distress. See, e.g., ECF No. 194 at 13 (Individual Plaintiffs' opposition) ("[T]he gravamen of plaintiffs' emotional distress claims . . . ."). For the sake of clarity, the Court assumes that they are. In Nevada, "an action to recover damages for injuries to a person . . . caused by the wrongful act or neglect of another" has a two-year limitation period. See Nev. Rev. Stat. Ann. § 11.190(4)(e) (West 2025). The Parties dispute whether this limitation period applies to claims for emotional distress. The Court finds that it does.

"When interpreting state law, federal courts are bound by the decisions of a state's highest court." Ariz. Elec. Power Coop., Inc. v. Berkeley, 59 F.3d 988, 991 (9th Cir. 1995). "In the absence of such a decision, a federal court must predict how the highest state court would decide the issue." Id. (citation omitted). Based on the Court's review, the Nevada Supreme Court has not yet clarified whether § 11.190(4)(e) applies to emotional distress claims.

Nevertheless, based on the plain text of the statute, the Nevada Supreme Court would likely find that it does. Per its text, this limitation period covers claims for "injuries to a person." Nev. Rev. Stat. Ann. § 11.190(4)(e) (West 2025). It is commonsense that emotional distress serves as a personal injury. See Carey v. Piphus, 435 U.S. 247, 263 (1978) ("Distress is a personal injury familiar to the law."). Thus, this Court finds that the Nevada Supreme Court would apply this two-year limitation period to claims for emotional distress. See, also, Orr v. Bank of Am., NT & SA, 285 F.3d 764, 781 (9th Cir. 2002) (finding that a claim for intentional infliction of emotional distress is subject to § 11.190(4)(e)).

Based on this limitation period, the Individual Plaintiffs' claim(s) for emotional distress are untimely. In Nevada, a cause of action "accrues when the wrong occurs and a party sustains injuries for which relief could be sought." Petersen v. Bruen, 792 P.2d 18, 20 (Nev. 1990). It is undisputed that Plaintiffs' claims stem from a fire that occurred on December 21, 2018. While their two-year limitation period would have originally expired on December 21, 2020, it was extended until April 22, 2021, by several executive orders based on the C0VID-19 Pandemic. See Dignity Health v. Eighth Jud. Dist. Ct. in & for Cnty. of Clark, 550 P.3d 341, 334 (Nev. 2024) (finding that several executive directives tolled the statute of limitations for "any legal action" for 122 days). Plaintiffs filed suit on December 8, 2021. Therefore, they are barred from pursuing claims based on emotional distress.

To the extent that Plaintiffs are asserting independent claims for emotional distress, the Court finds that they are untimely and fail as a matter of law. Accordingly, the Court grants summary judgment against them. With that being said, the Court expresses no opinion on what damages are available to Plaintiffs based on their remaining claims.

   **iv.** *Individual Plaintiffs' claim for damages based on their company's lost earnings.*

Finally, the Norcold Defendants argue that the Individual Plaintiffs lack standing to recover their business's lost earnings, and therefore they cannot recover them as a matter of law. The Court agrees.

    **1.** <u>The Court declines to strike the Declaration of Traci Marx.</u>

As a threshold matter, the Court addresses the Norcold Defendants' objection to material evidence produced by the Individual Plaintiffs on this issue. See Orr, 285 F.3d at 773 (A "court can only consider admissible evidence in ruling on a motion for summary judgment."); see also Norse v. City of Santa Cruz, 629 F.3d 966, 973 (9th Cir. 2010) (clarifying that a court must rule on evidentiary objections that are material to its ruling on summary judgment).

For the purposes of this motion, the Norcold Defendants object to certain portions of a declaration by Plaintiff Traci Marx, where she calculates her company's profits. See ECF No. 195-1. Specifically, they argue that the declaration fails to establish her competence or personal knowledge with respect to these calculations, as required by the Federal Rules of Civil Procedure.

See Fed. R. Civ. P. 56(c)(4). The Court disagrees.

In her declaration, Ms. Marx expressly attests to having personal knowledge over these calculations. Furthermore, the Court finds that her competence to perform these calculations can be inferred from the declaration itself, which describes Ms. Marx's extensive involvement in her company's financial affairs. See ECF No. 195-1; see also Barthelemy v. Air Lines Pilots Ass'n, 897 F.2d 999, 1018 (9th Cir. 1990) ("Rule 56(e)'s requirements of personal knowledge and competence to testify . . . may be inferred from a [declaration itself].").

Accordingly, the Court rejects the Norcold Defendants' objection to Ms. Marx's declaration.

### 2. The Marx Plaintiffs lack standing to seek damages for their company's lost earnings.

Nevertheless, the Court finds that the Marx Plaintiffs do not have standing to pursue damages for their company's lost profits.

"The standing requirements of Article III are familiar. A plaintiff must show that (1) he or she has suffered a 'concrete and particularized' injury to a cognizable interest, (2) which is 'fairly traceable to the challenged action of the defendant' and (3) which likely can be redressed by a favorable decision." Nat'l Council of La Raza v. Cegavske, 800 F.3d 1032, 1039 (9th Cir. 2015) (quoting Bennett v. Spear, 520 U.S. 154, 167 (1997)).

First, the Marx Plaintiffs have failed to satisfy the injury-in-fact requirement. The Individual Plaintiffs are seeking damages for losses suffered by their business: R & R Backhoe, LLC. As a preliminary matter, they are not formally pursuing these losses on behalf of their company. This makes sense, as they are not the proper parties to do so. See Nev. Rev. Stat. Ann. § 86.381 (West 2025) ("A member of a limited-liability company is not a proper part to proceedings by . . . the company."). Instead, the Marx Plaintiffs claim to be pursuing their own losses, as reflected by Backhoe's books.

In doing so, the Marx Plaintiffs have failed to show that they personally "suffered an injury in fact that is concrete [and] particularized." Center for Biological Diversity v. U.S. Bureau of Land Mgmt., 141 F.4th 976, 1007 (9th Cir. 2025) (citation omitted). To establish damages for their

1  "loss of income" claim, the Marx Plaintiffs rely on their company's losses—i.e., its lost income
2  and/or revenue. See ECF No. 194 at 11 (Plaintiffs' response in opposition). But they do not explain
3  how these losses specifically affected them. For instance, the record has no evidence of the Marx
4  Plaintiffs' corporate distributions before or after the fire. In short, it simply does not show how
5  much they personally lost vis-à-vis their company.

6  At this stage, the Marx Plaintiffs cannot satisfy the injury-in-fact requirement by merely
7  alleging that their company's losses "rebound directly to them." Id.; see also U.S. v. $133,420.00
8  in U.S. Currency, 672 F.3d 629, 638 (9th Cir. 2012) (citation omitted). Instead, they had to provide
9  "specific facts" by "affidavit or other evidence." See $133,420.00 in U.S. Currency, 672 F.3d at
10 638 (citation omitted) (requiring a greater evidentiary showing for standing at the summary
11 judgment stage). At best, the Marx Plaintiffs have shown that Backhoe suffered losses after the
12 fire. This is not enough to establish their own standing to recover these losses under Article III.

13 Second, the Marx Plaintiffs have failed to establish the traceability requirement. To recap,
14 the Marx Plaintiffs are attempting to personally recover Backhoe's losses over a three-year period.
15 See ECF No. 195-1 (declaration of Traci Marx). But the Marx Plaintiffs have done nothing to
16 show that all these losses are "fairly traceable" to the fire. Instead, they ask the Court to infer that
17 they are, even though these losses could be explained by a panoply of other causes—e.g., the
18 C0VID-19 Pandemic. Finally, the Court notes that this record would not enable a reasonable jury
19 to conclude that Backhoe's losses across a three-year period were caused by the fire, meaning that
20 the Marx Plaintiffs cannot not recover them through their remaining claims.

21 Ultimately, since the Marx Plaintiffs lack standing to pursue Backhoe's losses, the Court
22 grants summary judgment against their claim for these damages.

23 **C. Defendant CWI, Inc's Motion for Summary Judgment**

24 Defendant CWI, Inc. moves for summary judgment against all of Plaintiffs' claims against
25 it. The Court addresses each claim in turn.

26 **i. *Plaintiffs' strict product liability claim against Defendant CWI, Inc.***

27 Under Nevada law, "those who design, manufacture, distribute, or sell a dangerously
28 defective product" are subject to strict liability claims. See Hernandez v. Home Depot, Inc., 568

1  P.3d 119, 124 (Nev. 2025). It is undisputed that CWI, Inc. did not design, manufacture, distribute,
2  or sell the Refrigerator to Plaintiffs' family members. Instead, Plaintiffs argue that CWI, Inc.
3  should be considered a "seller" for the purposes of strict liability because it installed HTS safety
4  devices on behalf of Norcold. The Court disagrees.

5  Put simply, CWI, Inc. did not sell the HTS safety devices. It installed them as part of a
6  recall campaign. Plaintiffs' family members did not pay CWI, Inc. for these devices. Instead,
7  Norcold compensated CWI, Inc. for its labor. Based on this arrangement, CWI, Inc. was not acting
8  as a "seller of products" when it installed the HTS safety devices. See Allison v. Merck and Co.,
9  878 P.2d 948, 951 n.1 (Nev. 1994) (finding that the Clark County Health District did not "sell"
10 vaccines by administering them); see also Elley v. Stephens, 760 P.2d 768, 772 (Nev. 1988)
11 (describing a seller as being "engaged in the business of selling [ ] a product") (citation omitted).
12 After all, CWI, Inc. was not even paid for the HTS safety devices. Rather, CWI, Inc. was providing
13 an installation service on behalf of Norcold. The Nevada Supreme Court has historically declined
14 to impose strict liability on a party that merely "install[s] certain products." Calloway v. City of
15 Reno, 993 P.2d 1259, 1272–73 (Nev. 2000) (declining to define a contractor who installed a gas
16 line as a "seller" for purposes of strict liability), superseded by statute on different grounds as
17 recognized in High-Tech Aggregate, LLC v. Pavestone, LLC, 555 P.3d 1184 (Nev. 2024).

18 Finally, the Court declines Plaintiffs' invitation to redefine CWI, Inc. as a seller based on
19 non-binding authorities that concern sales representatives. See, e.g., Emerson v. Arctic Cat Sport,
20 Inc., No. 2:16-cv-001229-MMD-PAL, 2016 WL 6652447, at *2 ("The decisions do not stand for
21 the proposition that *all* sales representatives are categorically excluded from the definition of
22 sellers in NRS § 104.2103(1)(c)."). The Court need not, and will not, apply their standard to a
23 party that has not even purported to sell the specific products at issue.

24 Since CWI, Inc. did not design, distribute, manufacture, or sell the Refrigerator or the HTS
25 safety device, it is not subject to strict product liability as a matter of law. Therefore, the Court
26 grants summary judgment against Plaintiffs' strict product liability claim against it.

27    **ii.  *Individual Plaintiffs' fraudulent concealment claim against CWI, Inc.***
28 As above, the Court finds that the Individual Plaintiffs' fraudulent concealment claim

against CWI, Inc. fails as a matter of law because CWI, Inc. did not owe them a duty to disclose. See supra Part IV.B.ii.

Under Nevada law, a plaintiff must establish that the defendant was "under a duty to disclose [a material fact]" to prevail in a fraudulent concealment claim. See Dow Chem. Co. v. Mahlum, 970 P.2d 98, 110 (Nev. 1998) (citation omitted). This duty arises "from the relationship of the parties," namely a fiduciary relationship or a "special relationship." Id. (citation omitted). Parties enjoy a special relationship where one "reasonably imparts special confidence in the defendant and the defendant [ ] reasonably know[s] of this confidence." Id. (citation omitted).

Historically, the Nevada Supreme Court has demanded more than a mere commercial transaction to find a "special relationship." See, e.g., Mackintosh v. Jack Matthews & Co., 855 P.2d 549, 554 (Nev. 1993) ("The [buyers] were not only purchasing the property from [the seller], but were also financing the purchase with this [seller]."). In fact, it has been reluctant to find any kind of relationship between parties that were not "directly involved in the transaction from which [a] lawsuit arose." Dow Chem. Co., 970 P.2d at 111.

Based on the above law, the Court finds that CWI, Inc. did not owe the Individual Plaintiffs a duty to disclose. Initially, these parties were not engaged in a fiduciary relationship. Furthermore, the Court declines to find a "special relationship" based on their tenuous pseudo-commercial connection. As noted, the Individual Plaintiffs did not purchase the RV from CWI, Inc. Rather, their immediate relatives serviced it at CWI, Inc. Even if this tenuous connection somehow gives rise to a commercial relationship, it does not create a duty to disclose under Nevada law. See Nev. Power Co. v. Monsanto Co., 891 F.Supp. 1406, 1417 (D. Nev. 1995) (A "straightforward vendor-vendee relationship . . . creates no fraud-based duty to disclose.") (citation omitted) (cited approvingly by Dow Chem. Co., 970 P.2d at 110).

Plaintiffs urge the Court to recognize a "special relationship" based on public policy considerations. This request is misguided. It relies on authorities that deal with negligence claims. See, e.g., Sparks, 255 P.3d at 244 (discussing special relationships that give rise to a duty of care). The Nevada Supreme Court has already provided a more precise standard for "special relationships" in the context of fraud-based claims. See id. This case does not fall into that category

of cases under Nevada law.

### iii. *Plaintiffs' negligence claim against CWI, Inc.*

To prevail on a negligence claim, "a plaintiff must establish four elements: (1) the existence of a duty of care, (2) breach of that duty, (3) legal causation, and (4) damages." Sanchez ex rel. Sanchez v. Wal-Mart Stores, Inc., 221 P.3d 1276, 1280 (Nev. 2009) (citation omitted). CWI, Inc. urges this Court to grant summary judgment against Plaintiffs' negligence claim based on duty, breach, and causation. The Court declines to do so, and addresses each of these elements in turn.

#### 1. CWI, Inc. owed a duty of reasonable care.

"[T]he question of whether [a] defendant owes [a] plaintiff a duty of care is a question of law." Sparks, 255 P.3d at 244 (citation omitted). "[I]f this court determines that no duty exists, it will affirm summary judgment." Id. (citation omitted).

The Court has little difficulty concluding that CWI, Inc. owed the Individual Plaintiffs a duty of care when it installed the HTS safety device. Under basic principles of tort law, a person has a duty to conform to the standard of care that a reasonably prudent person in similar circumstances would exercise. See Merluzzi v. Larson, 610 P.2d 739, 742 (Nev. 1980), overruled on other grounds by Smith v. Clough, 796 P.2d 592 (Nev. 1990). This duty generally extends to the foreseeable victims of a person's negligence. See id. at 412–13 (citing generally Palsgraf v. Long Island R. R., 248 N.Y. 339 (N.Y. 1928) (limiting a defendant's duty to reasonably foreseeable harm)).

When it installed the HTS safety device, CWI, Inc. had a duty to exercise the same degree of care that a reasonably prudent service provider would. Furthermore, it owed this duty to the Individual Plaintiffs, as the immediate family members of an RV's owners are foreseeable victims of a fire caused by the negligent installation of its safety devices. It does not matter that CWI, Inc. did not directly transact with these plaintiffs. CWI, Inc. should have foreseen that its services would impact their safety. See Wright v. Schum, 781 P.2d 1142, 1143 (Nev. 1989) ("One who undertakes . . . to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for [ ] harm resulting from his failure to exercise reasonable care.").

**2.** Breach and Causation.

With CWI, Inc.'s duty established, the Court turns to the elements of breach and causation. From the outset, the Court notes that these elements are generally "'a question of fact for the jury,' and thus, this court is hesitant to '[grant] summary judgment in negligence cases.'" Sparks, 255 P.3d at 244 (citation omitted). Based on the record, the Court declines to do so here.

First, Plaintiffs have provided sufficient evidence for a jury to conclude that CWI, Inc. breached its duty of care. Multiple experts explain how CWI, Inc.'s installation services failed to comply with Norcold's instructions, which Norcold described as imperative to consumer safety. See, e.g., ECF No. 189-17. In his rebuttal report, Mr. Keifer claims that "[t]he existence of [an] airgap" between the Refrigerator's boiler tube and the HTS safety device's thermocouple block demonstrates its "improper installation." Similarly, in her deposition, Ms. Petty-Galis acknowledges that there appeared "to be a small gap at one side of the thermocouple saddle block." These pieces of expert evidence, in of themselves, give rise to a genuine dispute of material fact regarding CWI, Inc.'s negligence in installing the HTS safety device.

Second, the Court also finds that there is a genuine dispute of material fact as to causation. Norcold's own words demonstrate that the improper installation of the HTS safety device could result in a fire. For instance, in a March 21, 2012, letter, Norcold warns its service centers that "[f]ires have resulted from the HTS not being mounted properly." Furthermore, Ms. Petty-Galis also acknowledged that a gap between thermocouple block and the boiler tube "could potentially allow the boiler tube to get to a higher temperature before the power is interrupted." Based on this record, the Court cannot conclude that a reasonable jury cannot find that the negligent installation of the HTS safety device caused the fire.

In sum, there are genuine disputes of material fact as to CWI, Inc.'s negligence and causation. Accordingly, the Court declines to grant summary judgment against this claim.

### iv. *Nevada's limitation period for personal injuries.*

Finally, the Court declines to dismiss Plaintiffs' remaining claim against CWI, Inc. based on Nevada's two-year limitation period for personal injury claims. See NEV. REV. STAT. ANN. § 11.190(4)(e) (West 2025). Under Nevada law, this Court looks to the "true nature of [a] *claim*"

to determine the applicable limitation period. See Stalk v. Mushkin, 199 P.3d 838, 842 (Nev. 2009) (citation omitted and emphasis added). Here, Plaintiffs are asserting a negligence claim to recover damages stemming from a fire that consumed the Individual Plaintiffs' home. At its core, this is property-based claim. Accordingly, the Court declines to vaporize it based on the 2-year limitation period for personal injury claims.

### V.    CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Plaintiffs' Motion for Partial Summary Judgment, or in the Alternative for an Order Treating Specified Facts as Established (ECF No. 178) is **DENIED** in full.

**IT IS FURTHER ORDERED** that the Norcold Defendants' Motion for Partial Summary Judgment (ECF No. 182) is **GRANTED**. The Court grants summary judgment against the Individual Plaintiffs' claims for: negligence per se; medical expenses; damages based on an SBA loan; fraudulent concealment; emotional distress; and lost earnings.

**IT IS FURTHER ORDERED** that Defendant CWI, Inc.'s Motion for Summary Judgment (ECF No. 175) is **GRANTED IN PART** and **DENIED IN PART**. While Plaintiffs cannot rely on strict liability to proceed against Defendant CWI, Inc., they may continue to pursue their negligence claim against CWI, Inc. Finally, the Court also grants summary judgment against the Individual Plaintiffs' fraudulent concealment claim.

**IT IS FURTHER ORDERED** that the Parties shall file a Joint Pretrial Order by **November 7, 2025**.

**DATED:** September 30, 2025.

**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**